UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK R. GALLAGHER,                                    :

                   Plaintiff,                        :            10 Civ. 8338 (LTS)(AJP)

           -against-                           :            **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of                    :
Social Security,
                             :
               Defendant.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Laura T. Swain, United States District Judge:**

          Plaintiff Mark Gallagher, represented by counsel, brings this action pursuant to

§ 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision

of the Commissioner of Social Security (the "Commissioner") denying him Supplemental Security

Income ("SSI") and Disability Insurance Benefits ("DIB").  (Dkt. No. 2: Compl.)

          Presently before the Court is Gallagher's motion for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 12: Notice of Motion), and the Commissioner's

cross-motion for judgment on the pleadings (Dkt. Nos. 14 & 16: Gov't Notices of Motion & Cross-

Motion).

          For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings should be <u>DENIED</u>, Gallagher's motion for judgment on the pleadings should be

<u>GRANTED</u> and the case remanded to the Commissioner for further proceedings.

## FACTS

**Procedural Background**

On October 20, 2003, Gallagher filed for DIB and SSI.  (See Dkt. No. 8: Administrative Record filed by the Commissioner ["R."] 48-51.)  His application alleged that he was disabled since October 15, 2003 due to depression and anxiety.  (R. 48, 53.)  On May 11, 2004, the Social Security Administration ("SSA") denied both claims, finding Gallagher not disabled.  (R. 23-27.)  On May 21, 2004, Gallagher requested an administrative hearing.  (R. 30-31.)

Administrative Law Judge ("ALJ") James B. Reap conducted a hearing on September 8, 2005, at which Gallagher testified via video conference and was represented by counsel.  (R. 341-69.)  On December 29, 2005, ALJ Reap issued a written decision finding Gallagher not disabled.  (R. 11-20.)  ALJ Reap's decision became the Commissioner's final decision when the Appeals Council denied review on August 17, 2007.  (R. 5-7.)

On September 10, 2007, Gallagher filed a complaint in this District, claiming that the ALJ's decision was "not supported by substantial evidence and applie[d] an erroneous standard of law."  (Gallagher v. Astrue, 07 Civ. 8050, Dkt. No. 1: Compl. ¶ 7.)  On the same date, Gallagher filed a second application for DIB and SSI. (R. 432.)  By stipulation and order dated February 21, 2008, Judge Paul A. Crotty remanded the action to the Commissioner for "further administrative proceedings."  (Gallagher v. Astrue, Dkt. No. 6: 2/21/08 Order; see R. 433-34.)

On remand, ALJ Brian W. Lemoine consolidated Gallagher's applications and conducted an April 26, 2010 hearing, at which Gallagher testified via video conference and was represented by counsel.  (R. 380, 390-424.)  On July 26, 2010, ALJ Lemoine issued a written

decision finding Gallagher not disabled.  (R. 377-89.)   ALJ Lemoine's decision became the Commissioner's final decision sixty-one days after it was issued, i.e. September 25, 2010.  (See R. 378; see also pages 21-22 below.)

On October 25, 2010, Gallagher filed this action claiming that ALJ Lemoine's decision was "not supported by substantial evidence and applie[d] an erroneous standard of law." (Dkt. No. 2: Compl. ¶ 7.)

The issue before the Court is whether the Commissioner's decision that Gallagher was not disabled between October 15, 2003 and July 26, 2010 is supported by substantial evidence.

**Non-Medical Evidence**

Gallagher was born on June 15, 1958 and was forty-five years old at the alleged onset of his disability.  (R. 344, 398.)  Gallagher graduated from high school and also received an associate's degree in business administration.  (R. 344, 398.)  From 1986 to 1999, Gallagher was unable to work and collected SSI due to depression and anxiety.  (R. 77, 400-01.)[1]

Gallagher's SSI benefits were discontinued when he started working part time as a dishwasher for Ponderosa restaurant.  (R. 84, 211-12, 365, 400-01.)  Gallagher later worked as the chief dishwasher for the Orange County Community College ("OCCC") from August 2000 to October 2003, sweeping floors, filling beverage machines, wiping tables, accepting deliveries and

---

[1]     Gallagher claims his depression is caused by traumatic experiences in his youth due to hypospadius (R. 83, 90, 107, 364, 409-10, 523), a birth defect where the opening of the urethra is on the underside, rather than at the end, of the penis.  See Dorland's Illustrated Medical Dictionary 918 (31st ed. 2007).  This defect required three corrective operations and "created emotional distress and pain."  (R. 90, 107, 364, 409-10, 523.)

cleaning the refrigerator, freezer and shelves.  (R. 84, 344-45, 367, 398-99, 403.)[2]  While working

at Ponderosa and OCCC, Gallagher used a "job coach" provided to him by Occupations, Inc.  (R.

83, 401-02.)[3]  The job coach's role was to make "sure everything was going well on the job."  (R.

402.)  Gallagher met his job coach once every few weeks, but stopped using the coach during his

last year at OCCC because he was embarrassed.  (R. 402-03.)

        Gallagher quit his job on October 15, 2003 because his anxiety and depression

symptoms (heart palpitations, profuse sweating, lack of sleep and difficulty concentrating) "were

getting bad" and he "couldn't handle it anymore."  (R. 83, 346, 349-50, 400, 403, 405-06, 408.)

Gallagher has not applied for any jobs since because he is "just not capable of working."  (R. 415.)

Although Gallagher complains of poor eyesight, he claims his "problem is mental, not physical."

(R. 548.)

        Gallagher married in May 2004, and lives with his wife and dog in subsidized

housing.  (R. 346, 365, 410-11, 413, 543.)  Gallagher's wife suffers from bipolar disorder and

---

[2]    As part of this job, Gallagher frequently lifted twenty-five pound crates for two hours a day. (R. 84.)  The heaviest weight he lifted was fifty pounds.  (R. 84.)

[3]    According to Gallagher:

        Occupations, Inc. is one of Orange [C]ounty's largest human services providers.  It is a successful, complex, highly respected, progressive and competitive community-based rehabilitation agency that provides over 14,000 children, adults and families each year with high quality care and confidential treatment.  Its goal is to help them become as independent as possible, earning their own way in the community resulting in increased self-esteem and pride in a job well done.

(Dkt. No. 13: Gallagher Br. at 8 n.1.)

receives DIB.  (R. 346, 410-11.)  Gallagher's only source of income is his wife's DIB; he also receives food stamps and gets free medical coverage.  (R. 347, 367-68, 410-11.)

Gallagher's household chores include washing dishes, mopping the floor, vacuuming, grocery shopping and helping his wife with the laundry.  (R. 101, 103, 413-14, 546-47.)  While Gallagher used to prepare his own meals before getting married, his wife now does the cooking.  (R. 102, 413, 545.)  Gallagher attends group self-esteem meetings twice a week to help overcome his anxiety and manage his stress.  (R. 404-05.)  Gallagher drives to his self-esteem meetings and medical appointments, as well as to deliver Meals on Wheels with his wife once a week and other social purposes.  (R. 103, 347-51, 412, 546.)[4/]  Gallagher takes two to three naps a day - each nap lasting from a half hour to two hours - and likes to read the newspaper, watch TV and occasionally go to the movies.  (R. 101, 104, 346, 355-60, 362-64, 416, 547.)  Gallagher also walks his dog and goes shopping with his wife.  (R. 544.)

Gallagher has trouble sleeping and concentrating due to his anxiety, depression and medications.  (R. 101, 105-06, 362-63, 544, 549.)  At the time of his April 26, 2010 hearing, Gallagher was taking the anti-depressants Seroquel and Paxil.  (R. 355, 361, 408, 415-16.)

**Medical Evidence (2003-05)**

**Dr. Janneth Montoya**

On October 31, 2003, Gallagher was treated by Dr. Janneth Montoya for "[s]evere palpitation, shakiness, sweating and dizziness."  (R. 137-40.)  Dr. Montaya's psychological

---

[4/]      Gallagher was no longer doing any volunteer work by the April 26, 2010 hearing.  (R. 411-12.)

examination revealed that Gallagher was oriented to time, place and person and that his judgment and insight were normal.  (R. 140.)  Dr. Montoya also noted that Gallagher's mood and affect were appropriate and his recent and remote memory were normal.  (R. 140.)  Dr. Montoya diagnosed Gallagher with "[g]eneralized anxiety," and noted that his physical symptoms "are more likely secondary to severe anxiety."  (R. 140.)

At a follow-up on November 25, 2003, Gallagher reported that his anxiety was better after he started taking Risperdal together with his other anxiety medications.  (R. 141.)[5/]

**Dr. Leslie Helprin**

Consultative psychologist Leslie Helprin examined Gallagher on February 2, 2004. (R. 145-49.)  Dr. Helprin found Gallagher's demeanor cooperative and his manner of relating, social skills and overall presentation adequate.  (R. 146, 148.)  Gallagher's thought process was coherent and "goal directed with no evidence of hallucinations, delusions, or paranoia."  (R. 147.) Dr. Helprin found Gallagher was oriented in all three spheres and had clear sensorium.  (R. 147.) Gallagher's memory skills were "impaired due to anxiety," and his cognitive functioning was "below average." (R. 147.)  While his mood was "[s]omewhat anxious" and his affect was "mildly anxious," Gallagher's attention and concentration were intact.  (R. 147.)

Dr. Helprin noted that Gallagher was able to "dress, bathe, and groom himself, cook and prepare food, clean, launder, shop, and manage his own money."  (R. 147.)  Gallagher also was

---

[5/]     Gallagher already was taking Zoloft, Ambein and BuSpar for his anxiety.  (R. 111-15, 137, 141.)

able to drive, take public transportation, socialize with his girlfriend, play chess, watch TV, listen to the radio, read books, as well as attend Bible study classes and weekly church services.  (R. 147.)

Dr. Helprin concluded that Gallagher was "able to follow and understand simple directions and instructions and perform simple, rote tasks and several complex tasks independently, relate adequately with others, and would deal appropriately with stress of a job with job coach support to diminish[] job anxiety." (R. 148.)  While Gallagher alleged that he was unable to work due to stress and anxiety, Dr. Helprin found that "the results of the examination are inconsistent with [Gallagher's] allegations." (R. 148.)  Dr. Helprin diagnosed Gallagher with "Depressive disorder NOS" and "Anxiety disorder NOS" on Axis I and "Rule out borderline intellectual functioning" on Axis II.  (R. 148.)  Dr. Helprin recommended that Gallagher "continue with psychological and psychiatric treatment as currently provided." (R. 148.)

### Dr. Miriam James

On February 2, 2004, consultative internal medicine examiner Dr. Miriam James evaluated Gallagher (R. 150-53) and found no evidence of impaired judgment, significant memory impairment, hallucinations or delusions (R. 152).  Dr. James noted that Gallagher had a history of palpitations "secondary to anxiety and depression," and diagnosed Gallagher with depression and anxiety.  (R. 153.)

### Dr. S. A. Shih

In February 2004, Dr. S. A. Shih reported that Gallagher had undergone an electrocardiogram because of his hypertension and complaints of heart palpitations.  (R. 155.)  Dr. Shih prepared a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form about Gallagher on May 2, 2005 and found no physical limitations.  (R. 197-200.)

Due to Gallagher's anxiety, however, Dr. Shih noted that Gallagher should avoid temperature extremes, noise and dust, as well as climbing ladders and scaffolding.  (R. 198, 200.)

**Dr. Manoucher Lavian**

On March 2, 2004, treating psychiatrist Dr. Manoucher Lavian of Occupations, Inc. noted that Gallagher reported that his anxiety and depression had increased even though he was still taking Risperdal and he still had difficulty sleeping.  (R. 158.)  Dr. Lavian commented that Gallagher's grooming and hygiene had decreased as his anxiety and depression had gotten worse. (R. 159.)  Dr. Lavian also reported that Gallagher's understanding, short-term memory, concentration and persistence were limited.  (R. 160.)  Dr. Lavian concluded that Gallagher was unable to work at that time due to increased anxiety and depression.  (R. 159.)

In a June 30, 2004 medical record, Dr. Lavian and therapist Elizabeth Raun noted that Gallagher had a Global Assessment of Functioning ("GAF") of 65 and a past year high of 70, indicating mild symptoms.  (R. 231.)[6]  They noted that Gallagher had recently gotten married and was "improving in [his] ability to cope with depression."  (R. 231-32.)  They further noted that Gallagher was eating healthy, taking daily walks and appeared "motivated and compliant." (R. 232.) Gallagher also was taking Ambien, which helped him get "better rest," although he still experienced trouble falling asleep, making him feel tired during the day.  (R. 231-32.)

---

[6]   GAF refers to the individual's overall level of functioning and is assessed by using the GAF scale which provides ratings in ten ranges with higher scores reflecting greater functioning. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 27, 32, 34 (4th edition Text Revision 2000).  A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) [or] some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

On July 13, 2004, Dr. Lavian reported that Gallagher had normal speech, thought process, thought content and sensorium.  (R. 291.)  While Gallagher had an anxious mood and affect, he had "fair" judgment, attention span and concentration.  (R. 291.)

On August 3, 2004, Dr. Lavian completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form about Gallagher, reporting that he had marked limitation in his ability to:  (1) understand, remember and carry out detailed instructions; (2) "make judgments on simple work-related decisions"; (3) "[r]espond appropriately to work pressures in a usual work setting"; and (4) "[r]espond appropriately to changes in a routine work setting."  (R. 192-93.)  Dr. Lavian also found that Gallagher had slight limitations on his ability to understand, remember and carry out simple instructions, as well as on his ability to interact appropriately with supervisors, co-workers and the public.  (R. 192-93.)  Dr. Lavian further noted that Gallagher's "depression affects his ability to make good judgements at times and to remember detailed instructions often."  (R. 192.)  Dr. Lavian also reported that Gallagher's "depression affects [his] ability to fall asleep.  This affects his ability to respond appropriately to day to day pressures."  (R. 193.)  Dr. Lavian concluded that Gallagher's impairment affected his ability to "respond appropriately to supervision, co-workers, and work pressures in a work setting."  (R. 193.)

From August to November 2004, Gallagher had normal speech, thought process, thought content and perception; his judgment, attention span and concentration ranged from good to fair, and his sensorium ranged from normal and fair.  (R. 269, 275, 280, 286.)  While Gallagher's mood and affect were normal in October, he was anxious in August, September and November.  (R. 269, 275, 280, 286.)

From December 28, 2004 to January 10, 2005, Gallagher was involuntarily admitted to the Behavioral Unit of the Orange Regional Medical Center due to increasing anxiety and depression. (R. 311-28, 354, 366.) Gallagher claimed that he suffered from "low mood, insomnia, anxiety, feeling overwhelmed, feeling confused and [had] difficulty organizing his thoughts," but admitted taking his medications "somewhat irregularly." (R. 321.) At discharge, Gallagher had a GAF of 65, was alert and oriented and had good insight and judgment. (R. 323.) He as diagnosed with "Major depressive disorder [and] generalized anxiety disorder." (R. 323.)

On January 4, 2005, Dr. Lavian assessed Gallagher with a GAF of 65 and a high of 70 within the past year. (R. 226.) Gallagher reported that his anxiety had increased in the prior month and that he was having difficulty falling and staying asleep. (R. 226-27.) From January to March 2005, Gallagher had normal speech, thought process, thought content, perception and sensorium; his judgment was good and his attention span and concentration ranged from good to fair. (R. 253, 258, 263.) Gallagher's mood and affect were anxious in January, normal in February and flat in March. (R. 253, 258, 263.)

On March 29, 2005, Gallagher was assessed with a GAF of 65 and a high of 70 within the past year. (R. 221.) Although Gallagher reported "extreme anxiety" months earlier, he was feeling better and reporting "little or no anxiety symptoms" after a change in his medication. (R. 221.) From April to July 2005, Gallagher had normal speech, thought process, thought content, perception and sensorium; his attention span and concentration were normal and his judgment ranged from good to fair. (R. 238, 243, 248.) Gallagher's mood and affect were normal in June, but anxious in April and July. (R. 238, 243, 248.)

In a July 25, 2005 Mental Ability Report, Dr. Lavian reported that Gallagher had marked limitation in his ability to:  (1) understand, remember and carry out detailed or simple instructions; (2) "make judgments on simple work-related decisions"; (3) interact appropriately with supervisors, co-workers and the public; (4) "[r]espond appropriately to work pressures in a usual work setting"; and (5) "[r]espond appropriately to changes in a routine work setting." (R. 219-20.) Dr. Lavian also reported that Gallagher's "difficulty falling asleep and staying asleep" affects the "soundness of [his] judgment."  (R. 220.)  Dr. Lavian concluded that Gallagher's "depression and anxiety symptoms prevent him from working at this time" and that his "anxiety affects [his] ability to communicate in [a] meaningful way with others."  (R. 219-20.)

**ALJ Reap's Decision**

On December 29, 2005, ALJ Reap denied Gallagher's application for SSI and DIB benefits in a written decision. (R. 11-20.)  Specifically, ALJ Reap found that the medical evidence established the existence of "severe impairments" of depressive and anxiety disorders (R. 15), but the limitations did not rise to the level of the Listing of Impairments (R. 16).  ALJ Reap found that "while [Gallagher] may have impairments that have imposed limitations on his ability, [ALJ Reap] is not persuaded any symptoms or manifestations that occur are of such persistence, intensity or frequency as to preclude the performance of work related activities." (R. 18.)  ALJ Reap rejected Dr. Lavian's functional limitation assessments (see pages 9, 11 above), noting they were inconsistent with Dr. Lavian's own treatment notes, his assessment that Gallagher had a GAF of 65 and Dr. Helprin's findings – all which were "indicative of an individual who retains the ability to follow and understand at least simple instructions, perform at least simple tasks independently, relate to others

and deal with at least some levels of stress."  (R. 18.)  ALJ Reap concluded that Gallagher retained the residual functional capacity to perform his past relevant work as a dishwasher.  (R. 19.)

### Remand to the Commissioner

By stipulation and order dated February 21, 2008, Judge Paul A. Crotty remanded Gallagher's case to the Commissioner for "further administrative proceedings."  (See page 2 above.) On September 5, 2008, the SSA's Appeals Council remanded Gallagher's case to an ALJ, noting that ALJ Reap had failed to contact Dr. Lavian for "additional information or clarification of the inconsistency or conflict between the medical source statement and the treatment notes."  (R. 428-30.)  The Appeals Council also noted that, while ALJ Reap found that Gallagher could "perform simple, routine and repetitive type work in an environment that contains low to moderate levels of stress," ALJ Reap did not "express [Gallagher's] nonexertional capacity in terms of work-related functions."  (R. 429.)

The Appeals Council instructed the ALJ on remand to request that Dr. Lavian "provide additional evidence and/or further clarification of the opinions and medical source statements about what [Gallagher] can still do despite the impairments."  (R. 429.)  The ALJ must also "express [Gallagher's] nonexertional capacity in terms of work-related functions," including the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting."  (R. 430.)  Because Gallagher "requires a less stressful work situation, the ALJ will expressly consider what circumstances are stressful" for Gallagher.  (R. 430.) Finally, the ALJ must "[o]btain vocational evidence sufficient to allow a comparison between [Gallagher's] residual functional capacity and the mental and physical demands of his past relevant

work." (R. 430.)  The Appeals Council also instructed the ALJ to consolidate the current claims and

Gallagher's September 2007 claim.  (R. 430.)

**Medical Evidence (2007-10)**

### Dr. Manoucher Lavian

Dr. Lavian continued treating Gallagher, and reported on July 31, 2007 that Gallagher

had normal speech, thought process, thought content, perception, sensorium, mood and affect, as

well as good judgment, attention span and concentration.  (R. 637.)  During a September 25, 2007

examination, Dr. Lavian reported that Gallagher was responding well to medication and was alert,

cooperative and oriented in all three spheres.  (R. 631-32.)  Dr. Lavian further noted that Gallagher's

recent memory was intact and that he had organized thinking and average intelligence.  (R. 632.)

Additionally, Gallagher's mood and affect were stable.  (R. 631.)  On November 20, 2007,

Dr. Lavian reported that Gallagher had normal speech, thought process, thought content, perception,

sensorium, mood and affect, as well as good judgment, attention span and concentration.  (R. 626.)

From January 2008 to January 2009, Gallagher responded well to medication, was

alert, cooperative and oriented in all three spheres and had intact recent memory, organized thinking

and average intelligence.  (R. 583-84, 589-90, 595-96, 602-03, 607-08.)  Gallagher's mood and

affect were stable.  (R. 589, 595, 602, 607.)  Additionally, in May, August and December 2008,

Dr. Lavian reported that Gallagher had normal speech, thought process, thought content and

perception, and good attention span and concentration.  (R. 587, 592, 598.)  During that span,

Gallagher's judgment ranged from good to fair and his sensorium ranged from normal to intact.  (R.

587, 592, 598.)  While reporting that Gallagher's mood and affect were normal in May and August,

Dr. Lavian noted that Gallagher complained of being tired in December.  (R. 587, 592, 598.)

From March to June 2009, Dr. Lavian described Gallagher as "friendly" and reported normal speech, thought process, thought content, perception and sensorium; Gallagher's judgment ranged from good to intact and his attention span and concentration ranged from good to fair.  (R. 572, 574, 576, 578, 580.)  Gallagher's mood and affect were anxious in March, but normal from April through June.  (R. 572, 574, 576, 578, 580.)

In a June 23, 2009 letter to Gallagher's attorney, Dr. Lavian advised that, "[d]espite Mr. Gallagher reporting some alleviation of his symptoms of both depression and anxiety[,] he has not yet been able to return to work."  (R. 565.)  Additionally, Dr. Lavian noted that Gallagher complained of insomnia, which was probably related to his recent diagnosis of sleep apnea.  (R. 565.)  Dr. Lavian concluded that he supported Gallagher's disability claim "at this time" based on Gallagher's "report of continued symptoms of depression and anxiety, and his inability to return to the work."  (R. 565.)

**Dr. Steven Rocker**

On December 17, 2007, consultative internal medicine examiner Dr. Steven Rocker reported that Gallagher was "an overweight, well-developed, well-nourished male in no distress" and had "[n]o limitations for hearing, speaking, sitting, handling, standing, walking, lifting, or carrying."  (R. 745-47.)  Dr. Rocker noted that Gallagher reported spending his time "watching TV, listening to the radio, and reading."  (R. 745.)  Dr. Rocker diagnosed Gallagher with "[d]epression as per history," with a "[f]air" prognosis.  (R. 747.)

**Dr. Alex Gindes**

On January 10, 2008, consultative psychologist Dr. Alex Gindes examined Gallagher (R. 748-51) and found his thought processes "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia" (R. 749).  Gallagher had a "neutral" mood, clear sensorium and was oriented in all three spheres.  (R. 749.)  While Gallagher's affect was anxious, his speech and thought content were appropriate and his insight and judgment "[s]eemed fair."  (R. 749-50.) Dr. Gindes further noted that Gallagher's memory skills were "mildly to moderately impaired" by his anxiety, but Gallagher was able to recall 3/3 objects immediately and 1/3 after a five-minute delay.  (R. 750.)  Gallagher was also able to recite correctly three digits forward and two backwards. (R. 750.)

Dr. Gindes noted that Gallagher had difficulty falling asleep and staying asleep, which Gallagher blamed on "apprehension and restlessness."  (R. 748-49.)  Gallagher "also seems to have recurrent cardiac palpitations that he associates with anxiety."  (R. 749.)

Dr. Gindes also reported that Gallagher could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently."  (R. 750.)  Although Gallagher was "not always able to make appropriate decisions or relate adequately with others," Dr. Gindes noted that Gallagher's anxiety disorder was "largely under control" and he was "able to appropriately deal with stress."  (R. 750.)  Dr. Gindes concluded that Gallagher's psychiatric problems did "not appear to be significant enough to interfere with [Gallagher's] ability to function on a daily basis."  (R. 750.)

**Dr. R. McClintock**

On January 23, 2008, psychiatrist R. McClintock reviewed Gallagher's medical records and concluded that Gallagher did not have a severe impairment.  (R. 760-73.)  Specifically, Dr. McClintock reported that while Gallagher had "[g]eneralized persistent anxiety" disorder (R. 765), Gallagher had no restrictions on daily living and only mild limitations maintaining social functioning, concentration, persistence or pace (R. 770).  Dr. McClintock also opined that Gallagher did not have repeated episodes of deterioration.  (R. 770.)

**Dr. Ofer Jacobowitz**

On June 24, 2009, Gallagher saw Dr. Ofer Jacobowitz because he was having difficulty using his Continuous Positive Airway Pressure ("CPAP") machine[7] for his sleep apnea and did not feel the CPAP was improving his sleep quality.  (R. 569.)  Gallagher also claimed that he could not use the CPAP lately because he had an upper respiratory infection and that his poor sleep was also attributed to his depression and anxiety.  (R. 569.)  Dr. Jacobowitz reported that Gallagher had a normal physical examination, was oriented to all three spheres and had a normal mood and affect.  (R. 569-70.)

**Dr. Lalitha Chandrakhara**

Treating psychiatrist Dr. Lalitha Chandrakhara of Occupations, Inc. has seen Gallagher monthly since April 2009.  (R. 789.)  From August 2009 to March 2010, Gallagher had normal speech, thought process, thought content, perception, sensorium, mood and affect, as well

[7]     A CPAP machine prevents the airway from collapsing by increasing air pressure in the throat.   http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea (last visited March 22, 2012).

as intact judgment and good attention span and concentration.  (R. 799, 803, 818, 822, 829, 833, 837, 842.)

On May 17, 2010, Dr. Chandrakhara assessed Gallagher with a GAF of 70 and a high of 65 within the past year.  (R. 789.)  Dr. Chandrakhara noted that Gallagher reported making some progress, "but continues to have anxiety regarding [his] inability to sustain employment due to his illness in the future."  (R. 790.)  Gallagher also reported that his prescribed medications "help alleviate both his anxiety [and] depression," and that he was waiting to begin working two days a week at a sheltered workshop.  (R. 790.)  Gallagher further reported feeling lethargic at times, which Dr. Chandrakhara attributed to Gallagher's sleep issues or side effects of his medications.  (R. 791.)

Dr. Chandrakhara reported that Gallagher had no restrictions on daily living, slight restrictions maintaining social functioning and seldom had deficiencies in "concentration, persistence or pace resulting in failure to complete tasks in a timely manner."  (R. 792.)  Dr. Chandrakhara estimated, however, that Gallagher's mental impairment would cause him to miss work "[a]bout three times a month."  (R. 792.)  Dr. Chandrakhara also assessed Gallagher with repeated "[e]pisodes of deterioration or decompensation in work or work-like settings which cause [him] to withdraw from that situation or to experience exacerbation of signs and symptoms."  (R. 792.)  Dr. Chandrakhara noted that Gallagher "has had difficulty sustaining employment for long periods of time in the past due to experiencing an increase in psychiatric symptoms."  (R. 792.)

Gallagher was examined again at Occupations, Inc. on June 19, 2010 and had normal speech, thought process, thought content, perception, sensorium, mood and affect, as well as intact judgment and good attention span and concentration.  (R. 795.)

**Vocational Expert Testimony**

    Vocational expert Amy Leopold testified at Gallagher's April 26, 2010 hearing.  (R. 417-23.)  Leopold considered whether a hypothetical individual with Gallagher's age (51), education (high school and an associate's degree in business administration), no exertional limitations, but "mentally limited to the performance of simple, routine tasks" and "a low-stress workplace" (i.e., "no more than occasional interactions with the general public") could work as a dishwasher/janitor.  (R. 418-19.)  Leopold testified that the individual could work as dishwasher/janitor as the job is described by the Dictionary of Occupational Titles ("DOT"),[8] but not if more responsibility was added.  (R. 419.)  Leopold also noted that the individual could do the job even if he was limited to

---

[8]  Job number 318.687-010 is listed as "Kitchen Helper (hotel & rest.)" and defined as:

> Performs any combination of following duties to maintain kitchen work areas and restaurant equipment and utensils in clean and orderly condition: Sweeps and mops floors. Washes worktables, walls, refrigerators, and meat blocks.  Segregates and removes trash and garbage and places it in designated containers.  Steam-cleans or hoses-out garbage cans.  Sorts bottles, and breaks disposable ones in bottle-crushing machine.  Washes pots, pans, and trays by hand.  Scrapes food from dirty dishes and washes them by hand or places them in racks or on conveyor to dishwashing machine.  Polishes silver, using burnishing-machine tumbler, chemical dip, buffing wheel, and hand cloth.  Holds inverted glasses over revolving brushes to clean inside surfaces.  Transfers supplies and equipment between storage and work areas by hand or by use of handtruck. Sets up banquet tables.  Washes and peels vegetables, using knife or peeling machine.  Loads or unloads trucks picking up or delivering supplies and food.

U.S. Dep't of Labor, Dictionary of Occupational Titles 318.687-010 (4th ed. 1991).  The DOT has since been replaced by the O*NET OnLine system. http://www.oalj.dol. gov /libdot.htm (last visited March 22, 2012).  Under O*NET, this job is listed as Job number 35-9021.00 - Dishwashers and includes similar tasks.  See http://www.onetonline.org/link/ summary/35-9021.00 (last visited March 22, 2012).

"no more than occasional interaction with coworkers and supervisors." (R. 419-20.) In response to a hypothetical, Leopold noted that the individual would not be able to sustain employment if he was absent from work for three days a month due to his symptoms or if he were frequently "off task." (R. 420, 422-23.) Leopold also testified that the job would not be "generally available" if the individual needed a job coach on a regular basis. (R. 421-22.)

**ALJ Lemoine's Decision**

On July 26, 2010, ALJ Lemoine denied Gallagher's application for SSI and DIB benefits in a written decision. (R. 377-89.) ALJ Lemoine reviewed Gallagher's claim of disability resulting from his anxiety and depression, considering both Gallagher's testimony and all of the medical records. (R. 382-85.)

ALJ Lemoine found that Gallagher's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Gallagher's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible." (R. 388.) In particular, ALJ Lemoine noted that:

> [T]he evidence shows that [Gallagher] has remained quite functional with respect to his activities of daily living. He is able to care for his disabled spouse. He is fully independent in all aspects of his self-care, including showering, grooming and dressing. He can cook, clean, do laundry and shop. He can drive a car by himself and travel alone by means of public transportation. He can manage his own finances. He socializes with others, attends Bible study classes, and goes to church services on a regular basis. He also plays chess for enjoyment and he has volunteered for such organizations as Meals on Wheels. This level of activity is not consistent with the magnitude of functional compromise purported.

(R. 387.) ALJ Lemoine also noted that he "carefully observed [Gallagher] during the course of the hearing" and that Gallagher "related well, answer[ed] questions quickly and appropriately without

evidence of significant memory or concentration deficiencies." (R. 387.)  ALJ Lemoine found "no obvious evidence of any significantly limiting cognitive or emotional problem demonstrated during the course of the hearing." (R. 387-88.)

ALJ Lemoine rejected Dr. Lavian's "multiple contentions regarding [Gallagher's] inability to work in any capacity" (see pages 9, 11, 14 above) as unpersuasive because they were "clearly inconsistent" with Dr. Lavian's own treatment notes (R. 388).[9/]  Rather, ALJ Lemoine gave "substantial probative weight" to the assessments of the consultative examiners Drs. Helprin, James, Gindes and Rocker because their "impressions are wholly consistent with their own examination results and the totality of the overall objective medical documentation." (R. 388.)

While finding treating psychiatrist Dr. Chandrakhara's conclusions "generally reasonable," ALJ Lemoine rejected her assessment that Gallagher had repeated episodes of decompensation (see page 17 above) because that contention was "clearly contradicted by the Occupations progress notes which document [Gallagher's] mental status as remaining stable" (R. 388).

ALJ Lemoine applied the appropriate five step legal analysis (see R. 386-88), as follows:  First, ALJ Lemoine found that Gallagher had not "engaged in substantial gainful activity since October 15, 2003, the alleged onset date." (R. 386.)  Second, ALJ Lemoine determined that Gallagher had "severe impairments," particularly "a generalized anxiety disorder; a dysthymic disorder; and recently-diagnosed sleep apnea." (R. 386.)  Third, ALJ Lemoine found

---

[9/]    ALJ Lemoine noted that Dr. Lavian was "no longer treating at the Occupations Inc. Center, and further clarification of his assessments could not be obtained." (R. 388.)

that Gallagher did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (R. 386.) ALJ Lemoine determined that Gallagher "has the residual functional capacity to perform unskilled work that does not require greater than occasional interaction with members of the general public at all exertional levels." (R. 386.) ALJ Lemoine added that:

> With respect to [Gallagher's] mental status, the evidence chronicles a dysthymic disorder and a generalized anxiety disorder within the context of medical listings 12.04 and 12.06 respectively. These conditions have resulted in a mild limitation of [Gallagher's] ability to conduct his activities of daily living; and moderate restrictions for sustaining social functioning and maintaining concentration, persistence and pace. There has been one episode of decompensation demonstrated within the objective medical evidence of record ([Gallagher's] hospitalization at the Orange Regional Medical Center from December 28, 2004 through January 10, 2005.) It is accordingly concluded that [Gallagher] can perform work that is comprised of simple, rote tasks as would generally be associated with unskilled jobs. He is further unable to engage in more than occasional interaction with members of the general public. This conclusion is based upon the treatment reports of Drs. Lavian and Chandrakhara, which document [Gallagher's] long-term mental stability on his medication regimen.

(R. 386.) Fourth, ALJ Lemoine determined that Gallagher was "capable of performing his past relevant work as a dishwasher," noting that Gallagher "worked as a dishwasher for at least one year without the services of a job coach." (R. 388.) ALJ Lemoine concluded that Gallgher was not "under a disability, as defined in the Social Security Act, from October 15, 2003, through the date of [the] decision," i.e., July 26, 2010. (R. 388.)

On September 15, 2010, Gallagher filed exceptions to ALJ Lemoine's decision and requested review by the SSA Appeals Council. (R. 373-76.) On January 13, 2011, the Appeals Council informed Gallagher's counsel that the exceptions were untimely because they were filed more that thirty days after ALJ Lemoine's decision. (R. 370-72.) Because the Appeals Council

never formally assumed jurisdiction of the case, ALJ Lemoine's decision became the Commissioner's final decision sixty-one days after it was issued, i.e. September 25, 2010.  (See R. 378.)

## ANALYSIS

## I.  THE APPLICABLE LAW

### A.  Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).[10]

---

[10]    See also, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[11]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[12]

**B.    Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., 42 U.S.C. § 405(g); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v.

---

[11]  See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[12]  See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran

v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003);

Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[13/]   "'Thus, the role of the district

court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"

Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[14/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla

[and] such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"   Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g.,

Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada

v. Apfel, 167 F.3d at 773-74.[15/]   "[F]actual issues need not have been resolved by the

---

[13/]   See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36
F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v.
Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d
Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59,
61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167
F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v.
Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991);
Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker,
712 F.2d 1545, 1550 (2d Cir. 1983).

[14/]   See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13,
2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999)
(Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the
reviewing court should not substitute its own judgment for that of the Commissioner, even
if it might justifiably have reached a different result upon a de novo review." (quotations &
alterations omitted)).

[15/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184;
Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v.
Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel,
(continued...)

[Commissioner] in accordance with what we conceive to be the preponderance of the evidence."
Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct.
1207 (1983).   The Court must be careful not to "'substitute its own judgment for that of the
[Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"
Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[16/]   However, the Court will not defer to the
Commissioner's determination if it is "'the product of legal error.'"   E.g., Duvergel v. Apfel, 99 Civ.
4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Butts v.
Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005);
Tejada v. Apfel, 167 F.3d at 773 (citing cases).

    The Commissioner's regulations set forth a five-step sequence to be used in
evaluating disability claims.   20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540
U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct.
2287, 2291 (1987).   The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II),
> 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-
> step sequential evaluation process to determine disability.   See 20 CFR § 404.1520
> (2003) (governing claims for disability insurance benefits); § 416.920 (parallel
> regulation governing claims for Supplemental Security Income).   If at any step a
> finding of disability or non-disability can be made, the SSA will not review the claim
> further.   [1] At the first step, the agency will find nondisability unless the claimant
> shows that he is not working at a "substantial gainful activity."   §§ 404.1520(b),

---

15/    (...continued)
    174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

16/    See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart,
    312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1
    (2d Cir. Sept. 26, 1996).

> 416.920(b).  [2] At step two, the SSA will find nondisability unless the claimant
> shows that he has a "severe impairment," defined as "any impairment or combination
> of impairments which significantly limits [the claimant's] physical or mental ability
> to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the
> agency determines whether the impairment which enabled the claimant to survive
> step two is on the list of impairments presumed severe enough to render one
> disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the
> claimant's impairment is not on the list, the inquiry proceeds to step four, at which
> the SSA assesses whether the claimant can do his previous work; unless he shows
> that he cannot, he is determined not to be disabled.  [5] If the claimant survives the
> fourth stage, the fifth, and final, step requires the SSA to consider so-called
> "vocational factors" (the claimant's age, education, and past work experience), and
> to determine whether the claimant is capable of performing other jobs existing in
> significant  numbers  in  the  national  economy.    §§  404.1520(f),  404.1560(c),
> 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[17] accord, e.g., Salmini

v. Comm'r of Soc. Sec., 371 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641,

643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v.

Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[18]

---

[17]   Amendments to 20 C.F.R. § 404.1520 became effective September 25, 2003.  See 68 Fed.
Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at
25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and
redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20
C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the
claimant has an impairment that does not meet or equal a listed impairment, the SSA will
assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e).  The SSA  uses
the residual functional capacity assessment at step four to determine whether the claimant
can perform past relevant work and, if necessary, at step five to determine whether the
claimant can do any work.  See 68 Fed. Reg. 51156.

[18]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335
F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221
F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir.
1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala,
54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[19]

C.   **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[20]

---

[19]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[20]   See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308 (2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec. (continued...)

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v. Barnhart, 157 F. App'x at 346-47;  Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[21]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . .  report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician

---

[20]  (...continued)
Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[21]  See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence consider by the ALJ."); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

**D.**     **The ALJ's Duty to Develop the Record**

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." <u>Lamay</u> v. <u>Comm'r of Soc. Sec.</u>, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted) [<u>cert. denied</u>, 130 S. Ct. 1503 (2010)]; <u>accord</u> <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 386 (2d Cir. 2004), <u>reh'g granted in part and denied in part</u>, 416 F.3d 101 (2d Cir. 2005); <u>Pratts</u> v. <u>Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996); <u>see also</u> <u>Gold</u> v. <u>Sec'y of Health Educ. & Welfare</u>, 463 F.2d 38, 43 (2d Cir. 1972) (<u>pro se</u> claimant). Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." <u>Butts</u>, 388 F.3d at 386 (internal quotation marks omitted). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the

granting of benefits." Id. (internal quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[22/]

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO GALLAGHER'S CLAIMS

### A.   Gallagher Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Gallagher was engaged in substantial gainful activity after his application for SSI and DIB benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Lemoine's conclusion that Gallagher had not engaged in substantial gainful activity during the applicable time period (see page 20 above) favors Gallagher and is not contested by the Commissioner (see Dkt. No. 15: Comm'r Br. at 15).  The Court therefore proceeds to the second step of the five-step analysis.

### B.   Gallagher Demonstrated "Severe" Physical Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Gallagher proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

---

[22/]   See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416912(d), 416.912(e)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of H.H.S., 685 F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9 (S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Lemoine determined that the medical evidence indicated that Gallagher had "severe impairments," particularly "a generalized anxiety disorder; a dysthymic disorder; and recently-diagnosed sleep apnea."  (See page 20 above.)  Because this finding favors Gallagher and is not contested by the Commissioner (see Dkt. No. 15: Comm'r Br. at 15), the Court proceeds to the third step of the five-step analysis.

**C.     ALJ Lemoine's Finding That Gallagher Did Not Have A Disability Listed in Appendix 1 of the Regulations Cannot Be Affirmed Because ALJ Lemoine Failed to Properly Apply the Treating Physician Rule and Failed to Adequately Develop the Record**

The third step of the five-step test requires a determination of whether Gallagher had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

In order to qualify for a disability, Gallagher's depression must qualify as an affective disorder or anxiety related disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

Section 12.04 defines affective disorder, as an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome . . . . or

3. Bipolar syndrome . . . .

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Similarly, section 12.06 describes conditions required to demonstrate anxiety-related disorders:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning;

Or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Or

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

ALJ Lemoine determined that Gallagher suffers from a generalized anxiety disorder and a dysthymic disorder. (See page 20 above.)[23/] Presumably, that means that ALJ Lemoine found that Gallagher satisfied § 12.04(A) and § 12.06(A). With regard to the B criteria for the above disorders, however, ALJ Lemoine found "there is no objective basis for assessing marked limitations in any of the four Part B . . . categories." (R. 386.) Specifically, ALJ Lemoine found that Gallagher's anxiety and depression resulted in "a mild limitation" of Gallagher's activities of daily living and "moderate restrictions for sustaining social functioning and maintaining concentration,

---

[23/]   ALJ Lemoine found that Gallagher also was diagnosed with sleep apnea (see page 20 above), but "pointed out that no treating or examining source has mentioned that [Gallagher] exhibited any signs of daytime somnolence" (R. 387). As Gallagher does not challenge ALJ Lemoine's findings concerning Gallagher's sleep apnea (see Dkt. No. 13: Gallagher Br.), this Court will not address it.

persistence and pace." (R. 386.) ALJ Lemoine also found that Gallagher suffered only one episode of decompensation, namely his December 2004 hospilitazation at Orange Regional Medical Center. (R. 386.)

        In finding that Gallagher had no marked restrictions or difficulties, ALJ Lemoine rejected treating psychiatrist Dr. Lavian's July 25, 2005 report that Gallagher had marked limitation in his ability to: (1) understand, remember and carry out detailed or simple instructions; (2) "make judgments on simple work-related decisions"; (3) interact appropriately with supervisors, co-workers and the public; (4) "[r]espond appropriately to work pressures in a usual work setting"; and (5) "[r]espond appropriately to changes in a routine work setting." (See page 11 above.) Under the treating physician rule, however, Dr. Lavian's opinion must be given controlling weight if his opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); see also cases cited on page 27 & n.20 above.[24/]

        Reviewing the medical and record evidence, this Court finds that ALJ Lemoine properly decided not to give controlling weight to Dr. Lavian's marked limitations findings as they

---

[24/]    While the treating physician rule applies to Dr. Lavian's opinions regarding Gallagher's marked limitations, it does not apply to his opinions (see pages 11,14 above) that Gallagher was disabled and unable to work. See 20 C.F.R. § 404.1527(e)(1) (An opinion that a claimant is "'disabled'" or "'unable to work'" is not a medical opinion and is reserved for the Commissioner.); Hach v. Astrue, No. 07-CV-2517, 2010 WL 1169926 at *10 (E.D.N.Y. Mar. 23, 2010) ("[A]lthough the treating physician rule potentially applies to [the treating doctor's] opinion regarding the nature and severity of plaintiff's impairments, it does not apply to his ultimate conclusion in several reports that plaintiff was 'totally disabled' and 'unable to work.'").

were unsupported by the medical records.  Specifically, Gallagher testified that he is capable of cooking, shopping, washing dishes, mopping the floor, vacuuming, and helping with the laundry. (See page 5 above.)   Gallagher also cares for his disabled wife.  (See pages 4-5 above.) Additionally, Gallagher drove to his group self-esteem meetings and medical appointments, as well as to deliver Meals on Wheels with his wife once a week and other social purposes.  (See page 5 above.)  Socially, Gallagher and his wife were active in volunteer work and visited relatives. (See page 5 above.) Gallagher takes two to three naps a day - each nap lasting from a half hour to two hours - and likes to read the newspaper, watch TV and go to the movies.  (See page 5 above.) Gallagher also walks his dog and goes out shopping with his wife. (See page 5 above.)

Moreover, Gallagher's "GAF ratings have consistently remained within the range of 65-70, which signifies no greater than mild symptomology."  (R. 387; see pages 8 & n.6, 10, 17 above.)  This is consistent with the numerous medical reports finding that, from 2004 to 2009, Gallagher had normal speech, thought process, thought content and perception; normal, fair or intact sensorium and judgment; and good or fair attention span and concentration.  (See pages 9, 10, 13-14, 15, 16-17 above.)

While Gallagher was hospitalized in December 2004 due to increasing anxiety and depression, it was precipitated by his irregular medication use.  (See page 10 above.)  Gallagher had no behavioral problems at the hospital, "was compliant with medication and therapeutic programming" and, at discharge, had a GAF of 65 and was alert and oriented with good insight and judgment.  (R. 323; see page 10 above.)  In addition, Gallagher was feeling better by March 2005 and reporting "little or no anxiety symptoms" after a change in his medication.  (See page 10 above.)

ALJ Lemoine's determination is also consistent with the opinion of treating psychiatrist Dr. Chandrakhara who found that Gallagher had no limitations on daily living and only slight difficulties in maintaining social functioning. (See page 17 above.)   Moreover, Gallagher seldom had deficiencies in concentration, persistence or pace resulting in failure to timely complete tasks. (See page 17 above.)

Furthermore, ALJ Lemoine's findings were consistent with the opinions of the consultative doctors.   Specifically, Dr. Helprin found that Gallagher was "able to follow and understand simple directions and instructions and perform simple, rote tasks and several complex tasks independently, relate adequately with others, and would deal appropriately with stress of a job with job coach support to diminish[] job anxiety." (See page 7 above.)   Additionally, while Gallagher alleged that he was unable to work due to stress and anxiety, Dr. Helprin found that "the results of the examination are inconsistent with [Gallagher's] allegations." (See page 7 above.) Consultative psychologist Dr. Gindes also reported that Gallagher could "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently." (See page 15 above.)   Dr. Gindes further noted that Gallagher's anxiety disorder was "largely under control" and he was "able to appropriately deal with stress." (See page 15 above.) Dr. Gindes concluded that Gallagher's psychiatric problems did "not appear to be significant enough to interfere with [Gallagher's] ability to function on a daily basis." (See page 15 above.)

Consequently, because Dr. Lavian's findings of marked limitations were not "well supported" and were inconsistent with the other substantial evidence, ALJ Lemoine may not have

been required to give Dr. Lavian's opinion controlling weight.  (See cases cited on page 27 & n.20 above.)

Before completely rejecting a treating physician's opinion, however, the ALJ must consider the following factors in determining the weight to be given such an opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); see also cases cited on page 28 & n.21 above.

Here, in rejecting Dr. Lavian's "multiple contentions regarding [Gallagher's] inability to work in any capacity," ALJ Lemoine found Dr. Lavian's findings "clearly inconsistent" with Dr. Lavian's own treatment notes.  (See page 20 above.)  While ALJ Lemoine expressly addressed the fourth factor of consistency, there is no indication in his opinion that he considered any of the other factors in determining what weight to give Dr. Lavian's marked limitations findings.  This legal error is sufficient basis for remand.  See, e.g, Hach v. Astrue, 2010 WL 1169926 at *11 (Remand appropriate where the ALJ found the treating doctors opinion "inconsistent" with the "objective evidence," but did not address the remaining factors that supported the doctor's opinion.); Lopez v. Barnhart, 05 Civ. 10635, 2008 WL 1859563 at *12 (S.D.N.Y. Apr. 23, 2008) (Remanding case where the ALJ addressed only the third factor because the ALJ's opinion did "'not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'"

(quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir.2004)); see also, e.g., Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) (ALJ committed legal error by failing to "consider all of the factors cited in the regulations.").

       Moreover, when dealing with chronic mental impairments, a claimant "may be much more impaired for work than [his] symptoms and signs would indicate," and therefore "[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E). Consequently, regardless of whether Dr. Lavian's opinion was unsupported or inconsistent, ALJ Lemoine should have at least addressed that fact that Dr. Lavian was a psychiatrist and had treated Gallagher numerous times over five years before balancing the factors against Dr. Lavian's conclusions. See, e.g., Ellington v. Astrue, 641 F. Supp. 2d 322, 331 (S.D.N.Y. 2009) (While the ALJ found the treating physician's opinion unsupported and inconsistent, remand was appropriate because "the ALJ was obligated to give a more complete explanation as to why the balance of factors pointed against [the treating doctor's] conclusions" where the doctor had seen the claimant "at least thirteen times over the course of almost three years.").

       Had this been ALJ Lemoine's only error, this would have been a close case. ALJ Lemoine committed additional legal error, however, in failing to develop the record regarding the § 12.04(C) criteria. Specifically, a claimant satisfies the C criteria by showing that he has a (1) "[m]edically documented history of a chronic affective disorder of at least 2 years' duration"; (2) "that has caused more than a minimal limitation of ability to do basic work activities"; (3) "with

symptoms or signs currently attenuated by medication or psychosocial support"; and (4) "[r]epeated episodes of decompensation, each of extended duration."  (See page 33 above.)[25]

Gallagher's medical evidence makes a plausible claim that he satisfied the § 12.04(C) criteria.  First, Gallagher has been suffering from anxiety and depression for more than two years.  Second, as ALJ Lemoine himself found, "[t]hese conditions have resulted in . . . moderate restrictions for sustaining social functioning and maintaining concentration, persistence and pace." (R. 386.)[26]  Third, Gallagher has been medicated and regularly seeing psychiatrists and taking

---

[25]     Episodes of decompensation are defined as

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

[26]     Social functioning "refers to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2).  In work situations, social functioning "may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."  Id.  Additionally, concentration, persistence or pace "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).  Consequently, ALJ Lemoine's findings that Gallagher had moderate restrictions for sustaining social functioning and maintaining concentration, persistence and pace support the finding that Gallagher had minimal limitation in his ability to do basic work activities.

medication for his conditions.   Fourth, treating physician Dr. Lalitha Chandrakhara assessed Gallagher with repeated "[e]pisodes of deterioration or decompensation in work or work-like settings which cause [him] to withdraw from that situation or to experience exacerbation of signs and symptoms."  (See page 17 above.)

ALJ Lemoine rejected Dr. Chandrakhara's finding of repeated episodes of decompensation because it was "clearly contradicted by the Occupations progress notes which document [Gallagher's] mental status as remaining stable." (See page 20 above.) Dr. Chandrakhara, however, never specified what episodes she was referring to or if those episodes satisfied § 12.04(C).  Moreover, Dr. Chandrakhara was never asked to explain the possible inconsistency between her decompensation findings and the Occupations progress notes.  Before rejecting Dr. Chandrakhara's findings as "contradicted," ALJ Lemoine was required to "seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion." See, e.g., Calzada v. Astrue, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) ("[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion."); Lopez v. Barnhart, 2008 WL 1859563 at *13 ("In this case, the ALJ failed to properly develop the record.  Although he made 'multiple attempts to obtain all possible relevant records,' it does not appear that he made any attempt to obtain clarification from [the treating physician] regarding the perceived inconsistencies between his report and treatment notes." (record citation omitted)); SSR 96-5P, 1996 WL 374183 at *6 (July 2, 1996) ("Because treating source evidence (including opinion evidence) is important,

if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").[27]

   "Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration."  Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000); see, e.g., Meadors v. Astrue, 370 F. App'x 179, 183-84 (2d Cir. 2010); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); Baldwin v. Astrue, 07 Civ. 6958, 2009 WL 4931363 at *28 (S.D.N.Y. Dec. 21, 2009); Pimenta v. Barnhart, 05 Civ. 5698, 2006 WL 2356145 at *7 (S.D.N.Y. Aug. 14, 2006); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *15 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); Jones v. Apfel, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999) (Pauley, D.J. & Peck, M.J.) (& cases cited therein); Craven v. Apfel, 58 F. Supp. 2d 172, 187-88 (S.D.N.Y. 1999) (Preska, D.J. & Peck, M.J.).  However, if "the

---

[27] See also, e.g., Waters v. Astrue, No. 10-CV-110,  2011 WL 1884002 at *9 (D. Vt. May 17, 2011) ("In circumstances where an ALJ finds an inconsistency in the opinions of a treating physician or finds a treating physician's opinion not supported by objective medical evidence, the ALJ is required to re-contact the physician for clarification."); Dygert v. Astrue, No. 09-CV-325, 2010 WL 3909571 at *5  (N.D.N.Y. Sept. 7, 2010) ("If the ALJ felt that [the treating physician's] disability assessment was in conflict with her treatment notes or otherwise inconsistent with the evidence, he had a duty to re-contact her before making his decision."), report & rec. adopted, 2010 WL 3893910 (N.D.N.Y. Sept. 29, 2010); Ewald v. Comm'r of Soc. Sec., No. CV-05-4583, 2006 WL 3240516 at *2 (E.D.N.Y. Nov. 9, 2006) ("[E]ven if correct evaluation of the medical records revealed inadequate support for [the treating physician's] opinion, the ALJ's duty was to recontact [the physician] to fully develop the record." (citation omitted)); Rivas v. Barnhart, 01 Civ. 3672, 2005 WL 183139 at *23 (S.D.N.Y. Jan. 27, 2005) ("[W]here, as here, an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard.").

record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the Court may order a remand solely "for calculation and payment of benefits."  Parker v. Harris, 626 F.2d at 235.

In this case, a remand to the Commissioner is appropriate in order for the Commissioner to expressly consider the relevant factors to determine the appropriate weight to give Dr. Lavian's marked limitations findings and to obtain clarification and additional information from Dr. Chandrakhara concerning her finding of repeated episodes of decompensation.

### D.   ALJ Lemoine Also Failed To Properly Consider The Medical And Vocational Evidence As To Gallagher's Residual Functional Capacity To Perform His Past Relevant Work

The Court also finds that ALJ Lemoine's conclusions at the fourth and fifth steps (as to Gallagher's residual functional capacity) to not be sufficiently and clearly supported by the medical and vocational testimony.  Treating psychiatrist Dr. Chandrakhara found that Gallagher's mental impairment would cause him to miss work "[a]bout three times a month."  (See page 17 above.)  Vocational consultant Leopold testified that a hypothetical individual who would be absent from work three days a month would not be able to sustain employment.  (See page 19 above.)  ALJ Lemoine failed to address this issue at all in determining that Gallagher was capable of performing his past relevant work as a dishwasher.  (See R. 388.)  See, e.g., Geraw v. Comm'r of Soc. Sec., No. 11-CV-32, 2011 WL 6415475 at *7 (D. Vt. Dec. 21, 2011) ("The ALJ improperly failed to address the latter portion of [the treating physician's] opinion-that [the claimant] would miss work approximately two days each month.  This failure was not harmless, considering that the [vocational expert] testified that 'there would be no jobs' for an employee who was absent from work two or

more days each month."); Dambrowski v. Astrue, 590 F. Supp. 2d 579, 584-85 (S.D.N.Y. 2008) (ALJ's decision was not supported by substantial evidence where he ignored the vocational expert's testimony that an individual with the claimant's impairments would need to miss three days of work a month.).

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Gallagher was not disabled within the meaning of the Social Security Act during the period October 15, 2003 to July 26, 2010 is not supported by substantial evidence.   Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. Nos. 14 & 16) should be DENIED, Gallagher's motion for judgment on the pleadings (Dkt. No. 10) should be GRANTED and the case remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, 500 Pearl Street, Room 755, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Swain(with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994);

Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.),

cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892

F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy

v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:     New York, New York
           March 22, 2012

Respectfully submitted,

**Andrew J. Peck**
United States Magistrate Judge

Copies to:     Scott R. Goldstein, Esq.
               Susan D. Baird, Esq.
               Judge Laura T. Swain